UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
EON JOSEPH, HANSEL GREGORY, ABE         :
MEDJOUBI, and SAJJAD ALTAF,             :
                    Plaintiffs,         :    09 Civ. 1597 (DLC)
                                        :
            -v-                         :    OPINION AND ORDER
                                        :
MARCO POLO NETWORK, INC., DAVID         :
MEREDITH, and ANTHONY ORANTES,          :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For the plaintiffs:
Noah A. Kinigstein
315 Broadway, Suite 200
New York, NY 10007

For the defendants:
Roger H. Briton
Ana C. Shields
Jackson Lewis LLP
58 South Service Rd., Suite 410
Melville, NY 11747


DENISE COTE, District Judge:

        Plaintiffs Eon Joseph ("Joseph"), Hansel Gregory

("Gregory"), Abe Medjoubi ("Medjoubi") and Sajjad Altaf

("Altaf"), former employees of Marco Polo Network, Inc., ("Marco

Polo"), bring this lawsuit alleging employment discrimination

pursuant to 28 U.S.C. § 1981 ("Section 1981"); Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000-e et seq. ("Title

VII"); and New York State and New York City human rights laws

against Marco Polo, David Meredith ("Meredith"), and Anthony Orantes ("Orantes").  The plaintiffs allege that they were discriminated against on the basis of one or more of the following characteristics: age, religion, race, color, and national origin; and that they were fired in retaliation for their complaints of discrimination.  Following the completion of discovery, the defendants have moved for summary judgment on all claims.  For the following reasons, the motion is granted.

BACKGROUND

I.   The Parties' Employment at Marco Polo

The following facts are undisputed or are presented in the light most favorable to the plaintiffs.  Marco Polo is a "multi asset platform for electronic trading, local origination and global distribution of listed and unlisted securities in the emerging markets."  The company's business model depends on its highly confidential computer network and electronic securities trading platform.[1]  To attract and retain its clients, Marco Polo must convince them that its systems are highly secure.  If the security of its clients' data is compromised, Marco Polo may be liable to its clients, face legal and regulatory repercussions,

---

[1] During the relevant time period, Marco Polo did not have a "specific written security policy."  Nonetheless, access to its network and trading platform was restricted to those with authorized credentials.

and suffer reputational harm and irreparable damage to its business.

The plaintiffs were hired in 2006 and 2007 to work in Marco Polo's Information Technology ("IT") Department.  Specifically, Medjoubi was hired around August 21, 2006 as a network engineer. Altaf was hired as a systems administrator around January 22, 2007.  Joseph was hired as the Vice President of Network Engineering around October 2007.  Gregory was hired as a network engineer around November 26, 2007.

During the relevant time period, Medjoubi, Altaf, and Gregory reported to Beverly Davies ("Davies"), now the Senior Vice President of Technology, and Joseph.  Davies and Joseph reported to Orantes, who was the Director of Network Operations, until February 2008.  In late February 2008, Meredith was hired to serve as Marco Polo's Chief Technology Officer ("CTO").  At that time, Orantes ceased supervising any of the plaintiffs.

Medjoubi is Algerian-American and a Muslim.  In May 2008, he was fifty-four years old.  Altaf is Pakistani-American, describes himself as a "brown man," and is a Muslim.  Joseph is Guyanese-American and black.  In May 2008, he was fifty-one years old.  Gregory is West-Indian-American and black.  In 2008, Marco Polo employed approximately 93 individuals from the following racial and ethnic backgrounds: 27% Caucasian; 42% Hispanic; 12% Asian Indian; 13% Asian; and 5% African American.

3

The founder and CEO of Marco Polo, Vinode Ramgopal ("Ramgopal"), is originally from Guyana.

  II.  Meredith's Supervision of the IT Department

Meredith was hired in early 2008 to improve network performance and reliability, to lead the IT team, and to help the company expand into new markets.  He immediately made clear to his team that he expected "results."  Joseph, who had been hired a few months before Meredith, had been given a similar mission by management.  Joseph's job was to improve the reliability of the Marco Polo network and the IT Department's performance.

Around the first week of March 2008, Marco Polo's network suffered a major outage that lasted forty-five minutes.  A network outage of that length is "devastating" to a company like Marco Polo.  The staff of the IT Department, including Joseph, Altaf, Medjoubi, and Gregory, was responsible for restoring the network's functionality.  Meredith was unhappy with how the IT team handled the outage.

In that same month, Meredith and Altaf had a tense interaction in which Meredith told Altaf that an IT job was not a forty-hours-a-week job.  This was contrary to Altaf's understanding of the policy Joseph put in place in the four or so months prior to Meredith's arrival, which had granted IT

4

staff time off in exchange for overtime hours they worked. Altaf told Meredith that he would require a larger salary if he was made to work more than forty hours a week.  Altaf testified that Meredith told him that if he kept agitating for extra pay or time off that there might not be a place in the company for him.

Over the course of the spring, Meredith hired three employees with whom he had previously worked elsewhere.  Joseph admits that there was a need for more staff in the IT department.  One of the new hires, Ed Cholar ("Cholar"), supervised Gregory.

On May 1 and 2, which were a Thursday and a Friday, Meredith gave oral performance reviews to each of the plaintiffs.  From the plaintiffs' perspectives, the reviews were negative.  Medjoubi testified that, among other things, Meredith critiqued Medjoubi's over-reliance on e-mail.  Altaf testified that Meredith critiqued his failure to welcome one of the new IT employees and his communication skills.  Joseph testified that Meredith told him he was not performing "up to par" and listed several items that Joseph had failed to accomplish.  In Gregory's case, Meredith told him that it was difficult to assess his performance and that he needed to be more visible to managers other than Joseph, and that he should "align" himself with Cholar.  In addition to these substantive remarks, each

plaintiff alleges Meredith told him that he did not "fit" the image of the company or the direction in which the company was heading, and would be reviewed again in 60 days.

### III. Altaf's May 2 and May 5 E-Mails

In response to his performance review, Altaf sent Ramgopal, Marco Polo's CEO, an e-mail on May 2, 2008, titled "60 Day Review & Threats of Termination."  In the e-mail, Altaf asked to meet with Ramgopal because he had been "harassed and asked to leave" repeatedly by Meredith.  Altaf complained that Meredith's review of him the prior day was vague and very negative despite Altaf's good performance.  He rebutted several criticisms that he said Meredith had made about his work and his expected work hours.  Altaf stated that "Meredith conveyed that . . . he wanted to terminate me and he will terminate me if I do not perform well on the job according to [the] above-mentioned standards.  This is really not fair."  According to the e-mail, Meredith had also "invited" other IT staff members to leave Marco Polo.  Altaf expressed his belief that Meredith wanted to fire the current IT staff to make room for more of Meredith's former employees.  In closing, Altaf told Ramgopal that, since Marco Polo lacked a human resources office, Altaf "ha[d] to come to [Ramgopal] to report any thing which I feel discriminatory."

The following Monday, May 5, Altaf e-mailed Ramgopal and Clifford Goldman ("Goldman"), Marco Polo's Chief Administrative Officer, an e-mail titled "Workplace Harassment, Gross Mis-Management Of Funds, Discrimination And Violation of Equal Opportunity Employer Law" (the "May 5 E-Mail").  The May 5 E-Mail was "co-signed" by and copied to Medjoubi and Gregory. Altaf stated that the e-mail was his "formal complaint" about harassment, mismanagement, discrimination, and violations of the equal opportunity laws.  In addition to repeating the arguments made in the May 2 e-mail, Altaf made several allegations of unfair treatment.  First, Altaf said that he was "wrongly accused" by Meredith of failing to communicate effectively with clients, and that he was being judged more negatively than a colleague, Joe Ramos ("Ramos"), because he was naturally a shy person.  He also accused Meredith of allowing another employee to work on one project at a time, but he expected Altaf to do several things at once.  Altaf said that any performance review that did not take into account the records from Salesforce.com ("Salesforce"), the program the IT Department used to assign and track work assignments given to all employees, was "totally biased and unfair and amounts to discrimination and workplace harassment."

Second, Altaf charged that Meredith's hiring of employees from his former company without advertising those positions

violated the equal employment laws.  He expressed the belief
that Meredith intended to replace some or all of the four
plaintiffs with more of his old colleagues, which would be
discriminatory.  Finally, Altaf described a lunch that he and
Medjoubi attended in late April or early May with Orantes, at
which the topic of his religion was discussed.[2]

On May 5, Goldman e-mailed Altaf to tell him that he had
received the May 5 E-Mail, that he would begin an investigation,
and that he would report back to Altaf soon.  On May 6, the May
2 and May 5 e-mails were brought to the attention of Hugh
Blakeway Webb ("Webb"), the chairman of Marco Polo's Board of
Directors.  Webb and Marco Polo's compliance officer opened an
investigation into Altaf's allegations.  Webb planned to meet
with Altaf on Thursday, May 8 to discuss the charges Altaf had
made in the May 5 E-Mail.


IV.  Plaintiffs' Absences and the Security Breach at Marco
     Polo

From May 5 to May 9, Joseph took a planned vacation cruise
with his family; he had been granted permission to take the
vacation days a week earlier.  Both Medjoubi and Altaf requested
vacation time for Thursday, May 8 and Friday, May 9.
Additionally, Gregory had informed Marco Polo that he would not

---

[2] This lunch meeting is discussed more fully infra.

be in until the early afternoon on May 9 because he needed to take his mother to a doctor's appointment.  In order to assure coverage of the IT Department, Davies granted Medjoubi's vacation request but asked Altaf to reschedule.  On May 8 and 9, Altaf took two unscheduled sick days.[3]  Thus, three of the four plaintiffs were not at work on that Thursday and Friday, and Gregory arrived at work late on Friday.

On May 9, an employee at Marco Polo's service desk reported to Davies that some files were missing from her desktop computer.  After investigating, Davies suspected that the files were missing because someone had remotely accessed the employee's computer.  To verify her suspicion, she checked the activity log for Marco Polo's Virtual Private Network ("VPN"), which allows Marco Polo employees to access company files on Marco Polo's network remotely.  Davies learned that both Altaf and Medjoubi were logged into the network on May 9 at the same time using their VPN credentials, despite Altaf having taken the day as a sick day and Medjoubi having taken the day as a

---

[3] Davies testified that "during that entire week" of May 5 to May 9, she "observed both Altaf and Medjoubi's behavior to be unusual.  They met privately in closed door conference rooms and whispered to one another constantly whereas they typically did not engage in this behavior."  Both Medjoubi and Altaf dispute that they engaged in closed door conversations or whispered constantly to one another.

vacation day.  Davies testified that, based on this information,[4] she "became concerned about Medjoubi and Altaf's intentions" and contacted Webb to tell him about the problems with the employee's desktop computer and Medjoubi and Altaf's VPN access. Webb and Davies contacted Meredith, who was in Chile on business, to apprise him of the situation.

The evening of May 9, Goldman received two error messages when he tried to send e-mails to Meredith.  He contacted Davies to investigate.  Davies discovered that Goldman's e-mail account had been reconfigured that evening so that duplicates of his ingoing and outgoing e-mails were being forwarded to two external e-mail accounts.  Upon further investigation, Davies learned that Meredith's account had also been reconfigured in the same way, and that Marco Polo's general counsel's e-mail had been accessed without authorization.  At this point, Davies feared that Marco Polo's network had been compromised and felt immense pressure to secure the network as soon as possible.

Together, Davies and Webb contacted Meredith in Chile again, and the three preliminarily concluded that Altaf and

---

[4] Davies testified that she became concerned about Medjoubi and Altaf's intentions because she had the impression that Altaf and Medjoubi did not typically work remotely when ill or on vacation.  Both Altaf and Medjoubi dispute that Davies would have had this impression because "Davies knew that the IT team was on call 24 hours a day, and that we would routinely check our tickets and log on to the VPN to do our work when we were out of the office."

Medjoubi were responsible for the e-mail manipulations.[5]
Meredith directed Davies to delete Altaf's and Medjoubi's VPN
credentials to prevent them from accessing the Marco Polo
network remotely.  Davies did so and took other steps to secure
the Marco Polo network that evening.  In the course of securing
the network, Davies discovered that all of the data in one
network sub-folder had been deleted on Thursday, May 8.  She
also discovered that Gregory had re-created Altaf's VPN
credentials for him after Davies had deleted those credentials.[6]
At that point, Davies deleted Altaf's entire account rather than
just his VPN access and deleted Gregory's VPN access as well.

---

[5] Although it is undisputed that in this telephone call Meredith
directed that Altaf and Medjoubi's access to the VPN be blocked,
the plaintiffs dispute that Davies, Webb, and Meredith concluded
who the culprits were during this phone call.  While Meredith
testified at his deposition that he did not recall _saying_ who he
thought was responsible for the e-mail manipulations during his
telephone conversation with Davies and Webb on May 9, he also
testified that he believed there was a connection between the
May 5 E-Mail from Medjoubi, Altaf, and Gregory and the e-mail
security breach because of Medjoubi and Altaf's simultaneous
absence from the office.  In their affidavits, both Davies and
Meredith testified that they preliminarily concluded that Altaf
and Medjoubi were responsible during the May 9 telephone
conversation.

[6] The parties dispute when Gregory re-created Altaf's account
credentials, but not that he did so.  Davies testified that,
according to the activity log for the VPN, Gregory re-created
Altaf's log-in credentials at 11:21 p.m. on May 9.  The
defendants have provided a print-out of the activity log in
support of the motion.  Altaf admits that he had learned on
Friday evening that he could not access the VPN.  Gregory
testified that he re-created Altaf's log-in credentials on the
afternoon of Saturday, May 10.

Meredith contacted Noel Turner ("Turner"), a professional in the area of information systems security, over the weekend and asked him to conduct an immediate investigation into the security of the Marco Polo network and to identify any other unknown breaches or weaknesses.  Turner told Meredith that he would begin his investigation on Monday morning.[7]

The morning of May 11, a Sunday, Meredith e-mailed Joseph to tell him that there had been "issues" with Altaf, Medjoubi, and Gregory while he was away and that their remote access to the network had been removed.  He asked Joseph not to have any contact with any of the three until Meredith had briefed him.  Joseph replied that afternoon, saying "Wow.  It must of [sic] been a very interesting week.  I'm still in [F]lorida.  We just got off the ship about an hour ago.  I have a family crisis with my family here in [F]lorida.  I will need to extend my vacation possible [sic] until [F]riday."  In response, Meredith told Joseph that someone had used Joseph's VPN credentials in the early morning of May 11, and said that since it sounded like Joseph had not logged in, Meredith would de-activate his credentials as a precaution.  Joseph quickly replied that he had

---

[7] At the conclusion of his investigation, Turner authored a report that he provided to Marco Polo on June 1, 2008 (the "Security Report").  The plaintiffs argue that this report is inadmissible.  As discussed further infra, it is unnecessary to decide this question because the Security Report has not been relied upon in deciding this motion.

used his laptop to log in to the network for the first time on May 10, but not on May 11.  When Davies e-mailed Joseph to confirm when he had logged out of the May 10 VPN session, Joseph stated that he was "not sure" if he logged out or if the session timed out on its own.  Later on Sunday, Davies learned that Joseph's VPN credentials had been used to log in to the VPN six times over the weekend.  Meredith and Davies then contacted Joseph to clarify when and how he had used the VPN, and received a "vague and uncertain" explanation from him.[8]  This explanation led them to suspect that Joseph was attempting to hamper their investigation.

V.   Decision to Terminate the Plaintiffs' Employment

On Monday, May 12, Joseph was absent due to his family emergency, Medjoubi (who had taken the preceding Thursday and Friday as vacation days) was absent due to illness, and Altaf (who had taken the preceding Thursday and Friday as sick days) took a vacation day.  Gregory did go to work, and when he arrived, Meredith and Davies questioned him about his re-creation of Altaf's VPN credentials.  Gregory admitted that he had re-created the account but stated that he had done nothing wrong.  During the interview, Davies mentioned that Gregory had

---

[8] Plaintiffs argue that Joseph's response was not vague, but do not offer any evidence of his response.

"signed that e-mail for Sajjad" (a reference to the May 5 E-Mail) and asked him why he had signed it instead of bringing the issue to her.[9]  Based on the interview with Gregory on Monday morning, Marco Polo determined that Gregory was negligent or involved in the security breach and sent him home.

Also on Monday, Turner told Meredith that he had verified that the security breaches Davies discovered over the weekend had taken place.  Turner also told Meredith that the IP address that had been used to create the e-mail forwarders had also been used to access Altaf's e-mail account.  Finally, Turner advised Meredith that both Medjoubi and Altaf had accessed Salesforce on May 8 and 9, which is the website that is used to track the status of work assignments within the IT Department and also contains "information regarding business contacts, names, addresses and other critical business information."  Every time an employee logs in to Salesforce, he or she is supposed to leave an entry showing what work was completed.[10]  The plaintiffs admit that Medjoubi and Altaf accessed Salesforce on May 8 and 9 without making any such entries.  At this news, Meredith feared

---

[9] While Davies claims that she did not engage in any retaliatory conduct against the plaintiffs, she does not dispute making this remark to Gregory.

[10] Medjoubi admits that it was possible to log in to Salesforce without leaving a record.  No plaintiff disputes that employees were supposed to make an entry every time the employee accessed the website.

that client contact information may have been stolen.  Meredith promptly recommended to Webb that all four plaintiffs be fired.

After discussing the situation with Marco Polo's outside employment counsel, Webb also spoke with Ramgopal before deciding to discharge the plaintiffs.  Joseph, Altaf, and Medjoubi were fired by letter dated May 12.  The letters to Medjoubi and Altaf stated that the company was continuing its investigation into the allegations made in the May 5 E-Mail. Gregory was discharged by letter dated May 16.  His letter also stated that the investigation related to the May 5 E-Mail was continuing.

In this lawsuit, Medjoubi alleges discrimination on the basis of his national origin, religion, and age.[11]  Altaf alleges discrimination on the basis of his race or color, national origin, and religion.  Joseph alleges discrimination on the basis of his race, national origin, and age.  Gregory alleges discrimination on the basis of his race and national origin. All four plaintiffs also allege that they were fired in retaliation for complaining of discriminatory treatment.

---

[11] Although the plaintiffs' brief in opposition to this motion makes passing reference to the alleged hostile work environment at Marco Polo, they have only brought discrimination and retaliation claims based on the termination of their employment.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will

properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see also Holcomb, 521 F.3d at 137.  Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb, 521 F.3d at 137.  The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

I.   The Plaintiffs' Discrimination Claims

The plaintiffs bring claims of employment discrimination under Title VII; Section 1981; New York Executive Law § 296 et

seq. ("NYSHRL"); and New York City Human Rights Law (N.Y.C.
Admin Code § 8-101 et seq.) ("NYCHRL").  Title VII provides that
it is an "unlawful employment practice for an employer . . . to
discharge any individual, or otherwise to discriminate against
any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e-2(a)(1).  "[A]n unlawful employment practice
is established when the complaining party demonstrates that
race, color, religion, sex, or national origin was a motivating
factor for any employment practice, even though other factors
also motivated the practice."  42 U.S.C. § 2000e-2(m); see
Holcomb, 521 F.3d at 137.  Thus, "[a]n employment decision . . .
violates Title VII when it is based in whole or in part on
discrimination."  Holcomb, 521 F.3d at 137 (citation omitted).

The same substantive standards apply to claims of
employment discrimination under Title VII, § 1981, and the
NYSHRL.[12]  Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d

---

[12] Medjoubi and Joseph allege age discrimination but they have
not brought claims under the Age Discrimination in Employment
Act ("ADEA"), 29 U.S.C. § 621 et seq.  Nonetheless, age is a
protected characteristic under both the NYSHRL and the NYCHRL.
It should be noted that ADEA claims require proof of "but-for"
causation.  Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 107
(2d Cir. 2010).  The law governing NYSHRL claims has been held
previously to be identical to the ADEA, and the Court of Appeals
has assumed, without deciding, that the NYSHRL also requires
proof of but-for causation.  Id. n.6.  On the other hand, the

Cir. 2010).  Claims brought under the NYCHRL are analyzed using the same framework as Title VII claims, Leibowitz v. Cornell Univ. 584 F.3d 487, 498 & n.1, but "must be reviewed independently from and more liberally than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted).

A. State and Federal Discrimination Claims

Claims of employment discrimination brought under Title VII are analyzed using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." Ruiz v. County of Rockland, 609 F.3d 486, 492 (2d Cir. 2010).  A plaintiff's burden in presenting evidence to support a prima facie case is "de minimis." Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (citation omitted).

---

NYCHRL requires only that a plaintiff prove that age was "a motivating factor" for an adverse employment action. Weiss v. JPMorgan Chase & Co., No. 06 Civ. 4402(DLC), 2010 WL 114248, at *1 (S.D.N.Y. Jan. 13, 2010).  Under either of these two evidentiary standards, the result reached in this Opinion would be the same.

If the plaintiff satisfies this initial burden, "a presumption of discrimination arises, and the burden shifts to the defendant, who must proffer some legitimate nondiscriminatory reason for the adverse action." Spiegel, 604 F.3d at 80.  If the defendants can offer such a reason, the presumption of discrimination dissolves, and "the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Id. (citation omitted).  The plaintiff may do so by showing that the defendant's reasons were pretextual or that the defendant's reasons "were not the only reasons and that the prohibited factor was at least one of the 'motivating factors.'" Holcomb, 521 F.3d at 138 (citation omitted). Although the burden of producing evidence may shift between the parties under this framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Leibowitz, 584 F.3d at 499 (citation omitted).

### 1. The Plaintiffs' Prima Facie Case

The plaintiff bears the initial burden of "making out a prima facie case of discrimination." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  The defendants have conceded the first three prongs of the prima facie case for each plaintiff, i.e., they have conceded that the plaintiffs are

20

members of various protected classes, that they were qualified
for their positions, and that they suffered adverse employment
actions when they were fired.[13]   The defendants argue that
plaintiffs cannot satisfy the fourth prong, namely, to
demonstrate that "the adverse action occurred under
circumstances giving rise to an inference of discrimination."
Leibowitz, 584 F.3d at 498.

A plaintiff may satisfy the fourth prong through any of at
least three different kinds of evidence.   First, the plaintiff
may carry his burden "by showing that the employer subjected him
to disparate treatment, that is, treated him less favorably than
a similarly situated employee outside his protected group."
Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).   A
plaintiff relying on this type of evidence "must show [he] was
similarly situated in all material respects to the individuals
with whom [he] seeks to compare [him]self."   Id. (citation
omitted).   Second, a plaintiff may carry his burden by
demonstrating that the defendants have engaged in a pattern or
practice of intentional discrimination.   Robinson v. Metro-North
Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001).   To succeed
on this theory, a plaintiff "must establish that intentional

---

[13] The plaintiffs have not argued that any other action was an
adverse employment action.

discrimination was the defendant's 'standard operating procedure.'"   Id. (citation omitted).

Finally, "an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; . . . or the sequence of events leading to the plaintiff's discharge." Leibowitz, 584 F.3d at 502 (citation omitted).  "[B]ecause 'smoking gun' evidence of discriminatory intent is rare," a court must carefully review the record to search for any kind of evidence that would support an inference of intentional discrimination.   Forsyth v. Fed'n Emp't & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005).

The plaintiffs allege that two Marco Polo employees, Orantes and Meredith, discriminated against them on four separate grounds: age, religion, national origin, and race or color.  Even in light of the minimal burden at this stage, the only claims for which the plaintiffs have made out a prima facie case of employment discrimination are age discrimination claims brought by Medjoubi and Joseph.

a. Meredith's "Image" Remarks

Before addressing each type of discrimination that the plaintiffs have alleged, one aspect of the plaintiffs' evidence

must be discussed.  All four plaintiffs testified that Meredith
made a comment to them that involved Marco Polo's or the
plaintiff's "image," or in one instance, "background."
Specifically, in a conversation about networking and engineering
at Marco Polo while the two were out to lunch, Meredith told
Gregory that the face of Marco Polo was changing and that some
people didn't "fit in the image of what he expected Marco Polo
to be."[14]  The other three plaintiffs testified that Meredith
made an "image" comment to them in their performance reviews in
May.  Medjoubi testified that Meredith told Medjoubi that he did
not "fit the image of the company at that time."  Joseph
testified that Meredith said that he was not "sure if [Joseph's]
image quite fits the direction that Marco Polo is heading."
Altaf testified that Meredith told him that he did not "see a
place for people of [Altaf's] background" in the company.

Each of the plaintiffs felt that the remark was
discriminatory.  Gregory testified in his deposition that
shortly after this conversation, he came under constant scrutiny
and was frequently criticized by Meredith, which caused him to
believe that Meredith's conversation about "image" went beyond
his professional vision to Gregory's personal characteristics.
Altaf interpreted the remark made to him as referring to his

---

[14] Meredith denies making the "image" remarks to or about any of
the plaintiffs and denies making any other discriminatory
remarks.

national origin, color, and religion.  The "image" remarks will
be considered, where relevant to the disposition of the motion,
in connection with the evidence offered by the plaintiffs with
respect to each of their claims.

          b. Age

Medjoubi and Joseph allege age discrimination.  In 2008,
Medjoubi was fifty-four years old and Joseph was fifty years
old.  Both have offered evidence of comments by Marco Polo
supervisors about their age.

Orantes once asked Medjoubi his age during a conversation
about Medjoubi's young children.  At a staff meeting in May or
June 2007, Orantes said to Medjoubi, "We passed on you, pappy."
Medjoubi didn't know what he was talking about and did not ask,
but interpreted the comment as referring to his age.  In his
deposition, Altaf testified that Orantes said to him that
Medjoubi was too old for his type of job.  According to Joseph,
Meredith told Joseph that Medjoubi was too old for his job and
that the company needed to fire him because he was not "keeping
up."

In early March 2008, Meredith informed Joseph that he
wasn't happy with the work that Joseph was doing.  In mid-March,
Meredith told Joseph, more specifically, that he wasn't
responding fast enough to issues that arose, and questioned
whether it might have something to do with Joseph's age.  Joseph

testified that Meredith repeated the sentiment about Joseph's age at Joseph's performance review on May 2.  Joseph talked to Orantes about the age-related comments that Meredith made to him after his performance review because Orantes saw that Joseph was upset and asked what was wrong.

Medjoubi and Joseph have made out a <u>prima facie</u> claim for age discrimination.  Meredith's remark to Joseph that Medjoubi was too old for his job, and therefore needed to be fired, is sufficient to meet Medjoubi's burden at this stage because of Meredith's role in deciding to fire Medjoubi and the closeness in time between the age-related statement and the decision to fire Medjoubi.[15]  Joseph has stated a <u>prima facie</u> claim for age discrimination for the same reasons.  Joseph testified that Meredith made age-related remarks to him on more than one occasion, one of which was no more than ten days before he was fired.  As with Medjoubi, Meredith recommended that Joseph be fired, and he was.

The defendants' arguments that none of the comments made by either defendant was anything more than a stray comment is unpersuasive.  The Court of Appeals has described the standards

---

[15] Although the record is unclear with respect to the exact date of Meredith's statement to Joseph about Medjoubi's age, Meredith was only hired at the end of February.  Thus, the remark was made within two months of the date Medjoubi was fired.

by which district courts are to determine whether remarks are "stray," rather than indicative of discriminatory intent.

> The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.  The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be.

Henry v. Wyeth Pharma., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (citation omitted).  Thus, courts consider four factors to determine whether a remark is probative:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Id.

Here, Meredith supervised both plaintiffs, made the age-related remarks within two months of the plaintiffs' being fired, and recommended to Webb that the plaintiffs be fired. Indeed, Meredith made a comment about Joseph's age in Joseph's performance review just days before Joseph was fired.

The defendants also argue that the plaintiffs cannot make out a prima facie case of age discrimination because Medjoubi and Joseph were treated in the same way as the two plaintiffs

who have not brought age discrimination claims.  The defendants'
evidence of their legitimate nondiscriminatory reason for firing
the plaintiffs will be separately discussed.  For the purposes
of assessing the plaintiffs' prima facie case, the plaintiffs'
evidence of Meredith's explicit age-related comments in
connection with the performance of the plaintiffs' professional
duties is sufficient.

### c. Religion

Medjoubi and Altaf claim that they were discriminated
against on the basis of their religion, Islam.  They point to
Orantes's unfavorable comparison of them to their fellow
employee Francisco Salerno in November 2007, to a luncheon
conversation with Orantes in April 2008, and to Meredith's
linkage of Altaf and Medjoubi.

In November 2007, Orantes sent Davies an e-mail regarding
staffing of the IT Department that was subsequently forwarded to
Medjoubi and Altaf.  In the e-mail, Orantes asked for the
schedules for all employees.  Orantes wrote that Francisco
Salerno, another IT employee, had just arrived at the office
shortly before ten o'clock, "(which is okay, because he is a
good [sic]), but no Abe [Medjoubi] and no Sajjad [Altaf]."  At
his deposition, Altaf testified that the only differences he
could see between himself and Salerno were their religion,
national origin, and ethnicity.

In late April 2008, Orantes took Altaf and Medjoubi out to lunch.[16]  The conversation turned to religion, and Altaf and Medjoubi told Orantes that they were Muslims.  Orantes said that he had thought that Medjoubi was a Jew, that it was a shame they could not drink alcohol, and that Orantes would let Meredith know that they were Muslims.  Based on the short time that passed between this conversation and their negative performance reviews by Meredith on May 1 or 2, Medjoubi and Altaf concluded that Meredith must have discriminated against them based on their religion.  Finally, Joseph testified that at some point in the spring of 2008, Meredith told Joseph that he wanted to fire Medjoubi, and that Altaf would want to leave the company once Altaf saw what happened to Medjoubi.[17]

Medjoubi and Altaf have not made out a <u>prima facie</u> claim for religious discrimination.  Orantes's comments at lunch about their being Muslims do not raise an inference of discrimination; they reflect at most one of the four attributes of probative remarks.  Orantes did not supervise either plaintiff at the time of this conversation, nor did he have anything to do with the decision to fire the plaintiffs.  Moreover, neither the content nor the context of the remarks can reasonably raise an inference

[16] In the May 5 E-Mail, Altaf said this lunch occurred the day before their oral performance reviews.

[17] This comment was made in the same conversation during which Meredith made the comment that Medjoubi was too old for his job.

of discrimination.  Nothing in the remarks conveys anything but
curiosity or surprise.

While the plaintiffs have not offered evidence that Orantes
ever told Meredith that they were Muslims, even if he did, the
plaintiffs have not offered any evidence to support an inference
that they were fired due to religious discrimination.  There is
no evidence that Meredith ever made reference to either
plaintiff's religious beliefs or religious affiliation.  The
mere fact that Meredith may have been aware that Medjoubi and
Altaf were Muslims is not probative of discrimination in the
absence of evidence that Meredith held any beliefs about Muslims
in general or the plaintiffs' religion in particular.  While
Medjoubi and Altaf argue that Meredith's reference to their
"image" or "background" was discriminatory, these remarks are
insufficient to make out a prima facie case for religious
discrimination.  The plaintiffs have not shown that the remark
rationally could be interpreted as referring to their religion
rather than the plaintiffs' professional abilities or ambitions
or some other characteristic.  The vagueness of the comments
distinguishes them from those at issue in, e.g., Sassaman, where
the Court of Appeals held that remarks referring to a
plaintiff's protected characteristics reflected stereotyping and
did support the plaintiff's claim.  Sassaman, 566 F.3d at 312-
13.  Moreover, Meredith's performance reviews of Gregory and

Joseph, who have not alleged religious discrimination, were equally negative, if not more so.

Medjoubi and Altaf have also failed to show disparate treatment raising an inference of religious discrimination. While Altaf and Medjoubi claim that Salerno was treated more favorably, they rely solely on the November 2007 e-mail from Orantes calling Salerno "a good."[18]  This comment is not evidence of any preferential treatment that Salerno was given in the workplace or even reasonably capable of interpretation as discriminatory.  After all, the plaintiffs have offered evidence that Orantes did not learn that they were Muslim until roughly six months later, when Altaf and Medjoubi told Orantes they are Muslims.  The religious discrimination claims must be dismissed.

### d. National Origin

All four plaintiffs claim that they were discriminated against on the basis of their national origins.  Medjoubi is Algerian-American; Joseph is Guyanese-American; Gregory is West-Indian-American; and Altaf is Pakistani-American.  To support this claim they all rely on Meredith's comments about their failure to fit the company's image.  Medjoubi and Altaf also point to Orantes's November 2007 e-mail comparing Salerno to

---

[18] Salerno left the company before the May performance reviews and before the plaintiffs were fired.

Medjoubi and Altaf, and Orantes's statement to Altaf that he did
not like Medjoubi's accent.

   None of the plaintiffs have stated a prima facie claim for
discrimination based on their national origin.  First, the
plaintiffs put forward no evidence whatsoever relating to
discrimination based on Joseph's national origin.  The
plaintiffs do not argue that Meredith's "image" comment had
anything to do with Joseph's national origin, or for that
matter, his race.

   Second, for the same reasons that Orantes's November 2007
e-mail was not prima facie evidence of religious discrimination,
it is not prima facie evidence of national origin discrimination
against Medjoubi and Altaf.  It cannot reasonably be construed
as a comment on Altaf's Pakistani roots or Medjoubi's Algerian
heritage.  In any event, there is no evidence that Orantes had
any role in their firing or that Salerno was similarly situated
to them in connection with the decision to fire them.  Third,
with respect to the remark by Orantes that he did not like
Medjoubi's accent, this is, at most, a stray remark.  Because
Orantes was not involved in the decision to fire Medjoubi or
Altaf, and the record is unclear as to when the remark was made,
the plaintiffs have not shown that it is probative of
discrimination.

Finally, Meredith's "image" or "background" remarks are not probative of discrimination based on national origin, either. As previously discussed, the remarks cannot be reasonably interpreted as referring to four different countries of origin spread over three continents. Nor was diversity unusual at Marco Polo. Only about one-quarter of the workforce is Caucasian. Moreover, the plaintiffs have offered no evidence concerning Meredith's beliefs about people from Pakistan, Algeria, the West Indies, or Guyana.

e. Race or Color

Gregory, Joseph, and Altaf claim discrimination based on their race or skin color. Gregory and Joseph are black. Altaf describes himself as brown. They have each described how they came to feel that they were being judged based on their race and have compared their treatment to that given to co-workers.

As discussed previously, Altaf felt that the November 2007 e-mail from Orantes comparing him to Salerno was discriminatory and must have been due to his ethnicity; and that Meredith's "image" remark at his performance review about his "background" was also a discriminatory reference to Altaf's color. Gregory testified in his deposition that he believed Meredith's intense scrutiny of his work was based on Gregory's race. Joseph testified that Meredith's negative performance review was based

on unfair and unrealistic expectations, although he did not say that he felt it was because of his race.

Orantes's November 2007 e-mail is no more probative of race discrimination in connection with the termination of plaintiffs' employment than it was of religious or national origin discrimination.  Similarly, the plaintiffs' speculation that race discrimination may have motivated an adverse performance review or scrutiny of their job performance is not prima facie evidence of such discrimination.

The plaintiffs support their allegation of race discrimination principally by offering evidence that they argue shows disparate treatment.  Joseph alleges that Davies, a younger white woman, was treated better than he was because she was given sufficient information to complete her projects in a timely manner.  He also testified that even though Davies was "known for screwing up," she still works at the company.  Altaf identifies an employee named Ramos as being better treated than he was, as evidenced by Meredith re-assigning Altaf's work to Ramos.  Gregory complains that he was replaced by Cholar, who he considered a poor worker.

The plaintiffs have not shown that any of these three employees was similarly situated to them.  The plaintiffs have not offered any evidence that could have led Marco Polo to conclude that Davies, Ramos, or Cholar was responsible for or

involved with maliciously breaching the company's network security.  Thus, the plaintiffs have not shown that they were fired but Ramos, Davis, and Cholar were not despite the company's belief that they had engaged in similar misconduct.[19] Indeed, the plaintiffs have not even identified Cholar and Ramos's race.

Additionally, with respect to Cholar, Gregory has not offered anything more than his own negative opinion of Cholar's qualifications or abilities.  Although showing that a plaintiff was replaced by a less-qualified employee may be evidence of pretext, Loeb v. Best Buy Co., Inc., 537 F.3d 867, 875 (8th Cir. 2008) (age discrimination suit), Gregory's testimony is insufficient to support an inference of race discrimination absent any evidence regarding Cholar's race and how his qualifications compared with Gregory's.

In sum, the plaintiffs have not offered evidence to support a prima facie case of race or color-based discrimination.  The plaintiffs' own beliefs that certain actions were racially motivated is insufficient to draw an inference of discrimination.

---

[19] The plaintiffs argue that Davies was just as much a suspect based on Meredith's statement in his deposition that Davies was considered a suspect "no more than any other employee."  This testimony reflects that Marco Polo was intent on discovering who among all of its employees was responsible for the breach.  It does not constitute evidence that it ever had reason to suspect Davies' involvement in the breach.

2. Defendants' Non-Discriminatory Reasons

With respect to the age discrimination claims brought by Medjoubi and Joseph, the burden shifts to the defendants to produce evidence that they possessed a legitimate, nondiscriminatory reason for firing them.  The defendants' burden is "one of production, not persuasion." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  At this stage, the court is not to pass judgment on the soundness or credibility of the reasons offered by defendants, so long as the reasons given are "clear and specific" and, therefore, sufficient to raise a genuine issue of material fact as to whether defendants discriminated against the plaintiff.  Mandell v. County of Suffolk, 316 F.3d 368, 381 (2d Cir. 2003) (citation omitted).

Even assuming, arguendo, that each of the plaintiffs had made out a prima facie case on each of the discrimination claims, the defendants have produced evidence of a legitimate, nondiscriminatory reason for firing each of the plaintiffs. Specifically, the defendants have produced evidence that they reasonably believed that the plaintiffs were involved in a malicious security breach at Marco Polo.  This evidence includes the plaintiffs' motives, opportunity and access.  In addition, given the severity of the breach, Marco Polo has shown that the actions it took in response to its assessment of the plaintiffs'

activities -- the termination of their employment -- was not disproportionate to the severity of the risk Marco Polo faced to its business.

Each of the plaintiffs had received negative performance evaluations just one week before the security breach and three of them had immediately complained about their reviews to the company's chief executive officers.  All four employees arranged to be out of the office at the time of the security breaches, only one of them for a previously scheduled vacation trip.  The security breaches were extraordinarily serious.  They included the destruction of files, the compromise of the e-mail accounts of the company's executives, including its general counsel, and accessing computer files containing contact information for Marco Polo clients.

Davies and Meredith learned from Turner that Altaf's e-mail address was linked to the creation of e-mail forwarders.  They learned that Gregory re-instated Altaf's credentials for accessing the VPN after Marco Polo had deleted them and they were not satisfied with his explanation of the reinstatement.  Medjoubi and Altaf had accessed the VPN at the same time while they were both away from the office.  Finally, Joseph's VPN credentials were used to log into the network six times over the weekend.  When Davies and Meredith questioned Joseph about his use of the VPN while on vacation they were insufficiently

reassured.  This evidence more than satisfies the defendants'
burden in the second stage of the McDonnell Douglas analysis.
"[I]t is not the role of federal courts to review the
correctness of employment decisions or the processes by which
those decisions are made." Sassaman, 566 F.3d at 314 (citation
omitted).  The evidence is sufficient to provide a specific
reason for the termination decisions, all that is required to
meet the defendants' burden at this stage.  See Mandell, 316
F.3d at 381.

The plaintiffs argue that the defendants have not met their
burden of production because the evidence they offer is
inadmissible.  Specifically, the plaintiffs argue that the
conversations that the defendants had with Turner are
inadmissible hearsay.  The plaintiffs' argument, however,
largely rests on their assertion that the Security Report that
Turner provided to Marco Polo weeks after they were fired should
be treated as an expert report and is inadmissible because the
defendants never identified Turner as an expert witness.

The defendants identified Turner as a fact witness who was
involved in the investigation of the security breach and
disclosed his Security Report to the plaintiffs with the
defendants' initial disclosures.  The evidence of what Turner
discovered during his investigation on May 12 and of what Turner
told Davies and Meredith that day is admissible evidence from a

37

fact witness.  Davies and Meredith relied upon Turner's
description of his initial findings in making the decision to
discharge the plaintiffs.  As already noted, this Opinion has
not relied on the Security Report.

### 3. Plaintiffs' Ultimate Burden

In light of defendants' legitimate nondiscriminatory reason
for firing the plaintiffs, the McDonnell Douglas presumptions
"disappear from the case."  James, 233 F.3d at 156.  With
respect to Medjoubi and Joseph's age discrimination claims, the
final burden falls on the plaintiffs to offer "sufficient
evidence upon which a reasonable jury could conclude by a
preponderance of the evidence" that unlawful discrimination
caused the adverse employment action.  Gorzynski, 596 F.3d at
107.

Medjoubi and Joseph have failed to offer evidence to raise
a question of fact either that the defendants' proffered reason
for firing them was pretextual, or that age discrimination
played any role in that decision.  Certainly, the plaintiffs
deny that they took any part in the security breach at Marco
Polo.  They also present several arguments in an effort to
defeat this summary judgment motion.  They argue that Marco
Polo's failure to contact the plaintiffs in connection with the
promised investigation of the allegations in the May 5 E-Mail
proves that they were fired for discriminatory reasons.

Additionally, the plaintiffs argue that Meredith's oral performance reviews violated the "letter and spirit" of the employee manual, which they say requires reviews to be in writing.  Neither of these arguments has merit.

First, neither Medjoubi nor Joseph has shown that Marco Polo's reasons for firing them were pretextual.  They have offered no evidence that the security breaches did not occur or that they were not as serious as Marco Polo describes them to be.  They have also not offered evidence that undermines Marco Polo's good faith in believing that they were involved. Medjoubi does not dispute that he accessed the VPN while away from the office, supposedly on vacation, and that he did not leave the required record of that activity.  And Joseph does not dispute that his VPN credentials were used to log into the network six times over the weekend, again while he was supposedly on vacation.

Next, the references to age that were sufficient to make a prima facie case are insufficient to raise a question of fact regarding the defendants' discriminatory intent in firing the plaintiffs.  Given the gravity of the emergency facing Marco Polo and its undisputed need to act promptly to restore the integrity of its computer network and protect its business, to raise a question of discriminatory intent the plaintiffs must offer stronger evidence that the decision-makers were motivated

at least in part by the ages of these two plaintiffs when they fired the four plaintiffs.

Nor is the fact that Marco Polo failed to contact Medjoubi about the May 5 E-Mail after he was fired sufficient to show that discrimination was the real reason for his discharge.[20] Webb testified that he investigated the May 5 E-Mail by interviewing Meredith and Orantes.  In this context, Marco Polo's failure to complete its investigation of the May 5 E-Mail complaint by interviewing Medjoubi has little probative force.

Finally, the cited portions of the employee manual do not require performance evaluations to be in writing.  The manual states that during the review, the supervisor "will discuss significant performance events" with the employee and whether the employee has attained agreed-upon objectives.  Moreover, the plaintiffs do not explain how receiving an oral performance review, as opposed to a written one, was evidence of age discrimination.  The age discrimination claims brought by Joseph and Medjoubi must be dismissed.[21]

---

[20] Joseph was not a signatory to the May 5 E-Mail and therefore could have no expectation that Marco Polo would conduct an investigation regarding his treatment by any supervisor.

[21] For the same reasons, even if the remainder of the discrimination claims had survived to this stage of the analysis, they would fail.

B. NYCHRL Discrimination Claim

There is no support for a different outcome for any of the plaintiffs' discrimination claims brought pursuant to the NYCHRL. "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall." Loeffler, 582 F.3d at 278 (citation omitted). Even assuming all the plaintiffs made out a prima facie claim of discrimination, they have failed under any reading of the evidence to show that the defendants' proffered reason for firing them was a pretext for discrimination or that discrimination played any role. The undisputed evidence shows that the defendants acted on their reasonable, good faith belief that the plaintiffs committed serious misconduct. The plaintiffs have failed to offer any evidence that undermines that conclusion.

II. Plaintiffs' Retaliation Claims

In addition to their claims of discrimination, three of the plaintiffs also allege that Marco Polo fired them in retaliation

for complaining of discrimination.[22]  Title VII makes it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . in an investigation" held under Title VII. 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must show

> (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.

Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010).[23]

Retaliation claims under Title VII are analyzed under the same burden-shifting framework employed for considering claims of discrimination.  Id.  Thus, a court considers, first, whether the plaintiffs have established a prima facie case of

---

[22] While the complaint alleges retaliation on the part of all four defendants, Joseph abandoned this claim in the opposition to the summary judgment motion.

[23] The plaintiffs' retaliation claims pursuant to 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL are subject to the same legal analysis as the retaliation claims under Title VII in all respects relevant to this motion.  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720, 723 (2d Cir. 2010).  While the NYCHRL is "broader" than its state and federal counterparts in that the NYCHRL does not require a materially adverse action to maintain a retaliation claim, id. at 723, it is undisputed that the plaintiffs suffered a materially adverse employment action in this case.

retaliation; second, whether the defendants can articulate a
"legitimate, non-retaliatory" reason for the allegedly
retaliatory action; and third, whether the plaintiffs have
produced evidence that retaliation was "a substantial reason"
for the adverse action.  Fincher, 604 F.3d at 720, 723
(describing the difference between NYCHRL retaliation claims and
state and federal retaliation claims as the standard for an
adverse employment action).

     The plaintiff's burden in making a prima facie claim of
retaliation "is de minimis, and the court's role in evaluating a
summary judgment request is to determine only whether proffered
admissible evidence would be sufficient to permit a rational
finder of fact to infer a retaliatory motive."  Hicks, 593 F.3d
at 164 (citation omitted).  Altaf, Medjoubi and Gregory assert
that their retaliation claim is premised on the May 5 E-Mail
from Altaf which Medjoubi and Gregory co-signed.  The email was
sent to Goldman and Ramgopal, who were Marco Polo's Chief
Administrative Officer and CEO, respectively.  The three-page,
single-spaced document, which is described more fully supra,
complains principally that Meredith has recently hired as new
members of Marco Polo's IT Department people with whom he had
worked at his prior job without advertising the open positions
and with the intent of replacing Marco Polo's existing
workforce.  Altaf asserted that Meredith "wants to bring his own

43

people to replace old people and this is a discrimination [sic] not performance based decisions [sic] and this is not an equal opportunity but selective opportunity." Altaf explains that he knows his rights and is sure that the law will protect him. Altaf speculates that his and Medjoubi's recent poor performance reviews were also due to Meredith having learned that they were Muslim. The e-mail describes the complaints that Meredith made about Altaf's performance during the performance review and refutes in considerable detail each of those accusations of deficient performance.

While Marco Polo does not contest that the May 5 E-Mail constitutes protected activity, it should nonetheless be noted that this is not an issue without some complexity. An employee engages in a protected activity when he protests or opposes an employment practice that he reasonably believes, in good faith, violates the law. Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006). A complaint that does not identify an employment practice believed to be unlawful is not a protected activity. See Malaney v. El Al Israel Airlines, No. 07 Civ. 8773(DLC), 2008 WL 126642, at *6 (S.D.N.Y. Jan. 4, 2008); Moncrief v. N.Y. Pub. Library, No. 05 Civ. 2164(TPG), 2007 WL 2398808, at *6 (S.D.N.Y. Aug. 17, 2007). "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or

44

could reasonably have understood, that the plaintiff's
opposition was <u>directed at conduct prohibited by Title VII</u>."
<u>Galdieri-Ambrosini v. Nat'l Realty & Devel. Corp.</u>, 136 F.3d 276,
292 (2d Cir. 1998) (emphasis supplied).

The only clearly articulated complaint of discrimination is
the statement that Altaf and Medjoubi believe they may have
received poor performance reviews because they are Muslims.
Although the May 5 E-Mail refers to harassment, discrimination
and equal opportunity laws, those references relate to Altaf's
bitterness that Meredith is hiring employees he knows from his
prior work to replace Marco Polo's existing workforce.  The
plaintiffs do not attribute Meredith's favoritism in this regard
to animus toward them because of their national origin, race, or
in the case of Medjoubi, his age.

Marco Polo does not contest that it was aware of the May 5
E-Mail or that it took an adverse action against the plaintiffs
when it fired them.  It does contend, however, that the
plaintiffs have failed to show that the May 5 E-Mail caused the
termination of the plaintiffs' employment.

It is an unlawful employment practice to discriminate
against an employee "<u>because</u> he has opposed any practice made an
unlawful employment practice by [Title VII]."  42 U.S.C.
§ 2000e-3(a) (emphasis supplied).  "Title VII is violated when a
retaliatory motive plays a part in adverse employment actions

45

toward an employee, whether or not it was the sole cause."
Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).
Retaliation against an employee must occur "in circumstances
from which a reasonable jury could infer retaliatory intent."
Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).
The requirement of a causal connection "identifies what [adverse
employment action], if any, a reasonable jury could link to a
retaliatory animus.  The ultimate question in any retaliation
case is an intent to retaliate vel non."  Moore v. City of
Phila., 461 F.3d 331, 342 (3d Cir. 2006) (citation omitted).

     A plaintiff may satisfy the causation requirement in one of
two ways: "(1) indirectly, by showing that the protected
activity was followed closely by discriminatory treatment, or
through other circumstantial evidence such as disparate
treatment of fellow employees who engaged in similar conduct; or
(2) directly, through evidence of retaliatory animus directed
against the plaintiff by the defendant."  Hicks, 593 F.3d at 170
(citation omitted).  "Close temporal proximity between the
plaintiff's protected action and the employer's adverse
employment action may in itself be sufficient to establish the
requisite causal connection between a protected activity and
retaliatory action."  Kaytor, 609 F.3d at 552 (emphasis
supplied); see also Gorzynski, 596 F.3d at 110.

An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference.  See Freeman v. Ace Tel. Ass'n, 467 F.3d 695, 698 (8th Cir. 2006) (retaliation claim under state whistleblower statute); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (retaliation claim under ADA); Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998) (retaliation in the context of 42 U.S.C. § 1983); Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (retaliatory discharge from employment).  See also Peterson v. City of Rochester, No. 06 Civ. 6003(JWF), 2010 WL 1408013, at *9-10 (W.D.N.Y. Mar. 31, 2010) (intervening cause may be relevant to disproving pretext).

For instance, in Kiel, a deaf employee repeatedly asked his employer for a device that would enable him to make telephone calls, but was not given one.  Kiel, 169 F.3d at 1136.  On the day he was fired, Kiel told the owner of his company that he was submitting another request for the device, and was advised it would not be granted.  He shouted, "You're selfish," slammed a desk drawer, and made a remark about her recent purchase of a new car as she walked away, all in front of other employees. Id. at 1134.  The Eighth Circuit determined that the insubordination constituted "intervening unprotected conduct" and "eroded any causal connection that was suggested by the

temporal proximity of his protected conduct and his termination." Id. at 1136.

Similarly, in Yarde, a nurse had complained about a supervisor calling her a racially derogatory name.  Three months later, the nurse violated hospital policy by, among other things, divulging confidential information about a patient and creating a disturbance after she was suspended for divulging the information.  She was then fired after she failed to attend two due process hearings and two grievance meetings with her union. The court determined that "a reasonable factfinder could only conclude that there were substantial intervening events" between the protected activity and her suspension.  Yarde, 360 F. Supp. 2d at 562.

The plaintiffs have failed to establish a prima facie case for retaliation.  While the ten-or-so day interval between the May 5 E-Mail and the termination of the plaintiffs' employment is short enough to create an inference of causation, see Gorzynski, 596 F.3d at 110, the intervening security breach breaks that causal connection.  Evidence of significant misconduct by a plaintiff that fully justifies the adverse employment action and that occurs after the employee's protected activity extinguishes the probative force that might arise from the proximity in time between the protected activity and the adverse employment action.  See Gubitosi, 154 F.3d at 33.

Assuming _arguendo_ that the plaintiffs had established a
_prima facie_ case, the defendants have shown a non-retaliatory
reason for firing the plaintiffs.  It is undisputed that Davies,
Meredith, and Webb believed that all of the plaintiffs were
involved in the security breach and that they fired the
plaintiffs for this reason.  For the same reasons that the
defendants met their burden of showing a legitimate, non-
discriminatory reason for firing the plaintiffs, they have also
established a legitimate, non-retaliatory reason.

Finally, for essentially the same reasons that the
plaintiffs failed to carry their burden of presenting evidence
of a _prima facie_ case of retaliation, they have failed to offer
sufficient evidence to raise a question of fact as to whether
retaliation was a substantial reason for the termination of
their employment.  The undisputed evidence discussed in
connection with the discrimination claim demonstrates that the
security breach of Marco Polo's computer network and the
company's conclusion that the plaintiffs were responsible for
that breach were the only reasons the plaintiffs were fired in
the days immediately following the discovery of the breach.  The
only role that the May 5 E-Mail may have played in that decision
was the light that it could shed on the plaintiffs' motives for
participating in the breach and doing so at that specific point
in time.  Specifically, the plaintiffs may have hacked into

Meredith's, Goldman's, and the general counsel's email accounts to monitor the communications of management as it addressed their complaint.  Similarly, the plaintiffs may have accessed Salesforce to gather data to prepare a defense against the charges about their poor work performance.[24]  What the plaintiffs have failed to do is offer sufficient evidence from which a reasonable juror could conclude that retaliation for the act of sending the May 5 E-Mail played any role in the firing.

The plaintiffs principally argue that the security breach was a pretext for their firing.[25]  They rely on Marco Polo's failure to interview Altaf about the May 5 E-Mail on May 6 or 7.  Although Marco Polo scheduled an interview of Altaf for May 8, Altaf took that day and the next as sick days and then was fired before the interview had occurred.  Since Altaf's absence from work was the reason his interview did not occur as scheduled, the failure to hold the interview provides no basis whatsoever to conclude that Marco Polo did not intend to treat the complaints in the May 5 E-Mail seriously, and no basis to find that the security breach was simply a pretext for firing the plaintiffs.

---

[24] Altaf asserted in the May 5 E-Mail that since all of his assignments came through Salesforce, he could not be fairly reviewed without reference to Salesforce records.

[25] The plaintiffs again contend that the defendants should not be permitted to rely on the Security Report.  For the reasons already discussed, this argument need not be addressed.

III. Claims Against the Individual Defendants

The defendants have moved to dismiss the § 1981 and state law claims of discrimination against Meredith and Orantes individually.  There is no evidentiary basis for any claim against Orantes, a co-worker who did not supervise the plaintiffs during the relevant time period and had no involvement in the decision to fire them.  In light of the grant of summary judgment in Marco Polo's favor on all claims, defendants' arguments concerning the viability of the plaintiffs' claims against Meredith under § 1981, the NYSHRL, and the NYCHRL need not be reached.[26]

## CONCLUSION

The defendants' June 21 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED:

Dated:     New York, New York
           November 10, 2010

_____
DENISE COTE
United States District Judge

---

[26] There is no individual liability under Title VII.  Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003).

51